# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

AXA EQUITABLE LIFE INSURANCE
COMPANY,

      Plaintiff,

v.

JASON A. GRISSOM, et. al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

No. 3:11-cv-0618
JUDGE HAYNES

## M E M O R A N D U M

Plaintiff, AXA Equitable Life Insurance Company ("AXA"), a New York corporation, filed this action under 28 U.S.C. § 1332, the federal diversity statute, and 28 U.S.C. § 2201, the declaratory judgment statute, against the Defendants: Jason A. Grissom, individually and in his official capacity as executor of the estate of his deceased father, Daniel M. Grissom; Daniel B. Grissom; Joshua S. Grissom (collectively, the "Grissom sons"); and Lolita Camp, Daniel M. Grissom's surviving spouse, all of whom are Tennessee citizens. The gravamen of Plaintiff's claim is that in good-faith error, Plaintiff distributed to the Grissom sons, instead of Camp, the death benefits from the deceased Daniel Grissom's pension plan annuity ("the Plan"). AXA seeks this Court's determination whether Camp is the proper beneficiary of the Plan's annuity.

The Grissom sons filed an answer and counterclaim, as well as a crossclaim against Camp (Docket Entry No. 28), contending, in essence: (1) that Camp executed a valid prenuptial agreement waiving any claims to Grissom's estate, including the Plan benefits; (2) that the Grissom sons are the proper beneficiaries under the Plan; and (3) that Grissom's prenuptial agreement and estate planning documents, considered as a whole, reflect Grissom's intention not to designate Camp as his beneficiary under the Plan.

1

Camp filed an amended answer and counterclaim against AXA, as well as a crossclaim against the Grissom sons. (Docket Entry No. 30). As to AXA, Camp contends: (1) that she is the proper beneficiary under the Plan; (2) that AXA negligently failed to pay the benefit to her; and (3) that AXA's negligence caused her damages, including attorney's fees. (Id. at 5-7.) Camp's crossclaims against the Grissom sons are, in sum: (1) that she is the proper beneficiary under the Plan; (2) that AXA erroneously disbursed a portion of the Plan's benefit to Joshua S. and Daniel B. Grissom; (3) that Camp has neither a duty nor obligation to provide any benefit to the Grissom sons; and (4) that the Grissom-Camp prenuptial agreement is invalid or inconsequential to the Plan's beneficiary designation. (Id. at 7-9.)

In earlier proceedings, AXA and the Grissom sons agreed to a preliminary injunction restraining and enjoining the Grissom sons from withdrawing additional funds from their accounts, restraining and enjoining them from spending, transferring, encumbering, dissipating, using, or in any way disposing of the previously withdrawn funds, and restraining and enjoining Jason, as executor of Grissom's estate, from distributing the remainder of the death benefit to Daniel B. or Joshua S. Grissom. (Docket Entry No. 17).

Before the Court are the following motions:

(1) The Grissom sons' motion to dismiss Camp's crossclaims[1] (Docket Entry No. 42), contending: (1) that Camp's crossclaims are actually against AXA; and (2) that Camp's crossclaims fail to state claims against them. In her late response[2] (Docket Entry No. 46), Camp contends that her declaratory judgment claims sufficiently state claims against the Grissom sons;

---

[1] The Grissom sons' motion is styled a "motion to dismiss cross-complaint" of co-defendant Camp. (Docket Entry No. 42). Yet, under Federal Rule of Civil Procedure 13, "claims against [opposing parties] are counterclaims, and crossclaims [are claims] asserted against a [co-defendant] or 'coparty'." 3 James Wm. Moore et. al., Moore's Federal Practice § 14.09 (3d ed. 2011); Fed. R. Civ. P. 13.

[2] Under Local Rule 7.01 Camp had fourteen (14) days to file a response to the sons' motion to dismiss crossclaims (Docket Entry No. 42) and her response is untimely. Yet, the Court nonetheless considers the late-filed response.

2

(2) Camp's motions for summary judgment (Docket Entry Nos. 48, 50, 56, and 57).[3] Camp's first motion seeks summary judgment against AXA and the Grissom sons, and contends, in sum: (1) that under the Plan, she is the proper and designated beneficiary; (2) that the Grissom-Camp prenuptial agreement is either invalid or inconsequential to the AXA Plan; and (3) that Grissom did not object to the terms of the annuity contract, or its amendment. (Docket Entry No. 48). AXA responds that the Plan amendment is incorporated into the original contract, and seeks indemnification from the Grissom sons, if Camp is awarded damages from AXA. (Docket Entry No. 75). In their response, the Grissom sons contend that Camp is not entitled to judgment as a matter of law, and that there are several disputed issues of material fact. (Docket Entry No. 77);

(3) Camp's second motion for summary judgment[4] is against AXA, and contends, in essence: (1) that AXA's negligence forced Camp to hire a lawyer to assert her claims; (2) that attorney's fees are recoverable when an insurer fails to pay a claim; and (3) that AXA's negligence caused Camp's damages. (Docket Entry No. 50). In response (Docket Entry No. 72), AXA contends: (1) that the authorities Camp relies upon are not binding upon this Court; (2) that Camp has not established AXA's liability to her; and (3) that Camp's claims for attorney's fees as damages is not recognized by Tennessee law. (Docket Entry No. 50);

(4) AXA's motion for judgment on the pleadings (Docket Entry No. 52) challenges the Grissom sons' counterclaim (Docket Entry No. 28) contending, in sum: (1) that the Grissom sons' counterclaim fails to state a claim; (2) that the Grissom sons fail to state a claim for breach of contract; and (3) that the Grissom sons cannot use tort law or equity principles to circumvent a breach of contract claim. In response, the Grissom sons argue, in essence: (1) that their claims for AXA's breach of contractual and fudiciary duties to Grissom are sufficiently stated; (2) that the Grissom sons should be permitted to amend or supplement their pleadings because AXA failed to produce discovery documents; and (3) that the Grissom sons voluntarily dismiss their unjust enrichment claim. (Docket Entry No. 67). In reply, AXA repeats its earlier contentions and further contends that the Grissom sons' fail to allege any damages. (Docket Entry No. 82);

(5) AXA's motion for judgment on the pleadings (Docket Entry No. 54) challenges Camp's counterclaim (Docket Entry No. 30) contending, in sum: (1) that Camp's breach of contract claim fails to state a claim; (2) that Camp may not use tort law to circumvent the terms of the Plan, a contract; and (3) that Camp's claim for attorney's fees fails to state a claim under Tennessee law. In response, Camp contends that her claims for breach of contract and attorney's fees are cognizable. (Docket Entry No.

---

[3] Camp filed an additional motion for summary judgment (Docket Entry No. 56) that is identical to her earlier-filed motion (Docket Entry No. 48).

[4] Camp filed an additional motion for attorney's fees and financial damages (Docket Entry No. 57) that is identical to her earlier-filed motion (Docket Entry No. 50).

64). In reply, AXA asserts that Camp's response, (Docket Entry No. 64), is non-responsive to its motion. (Docket Entry No. 81); and

(6) The Grissom Sons' motion for summary judgment (Docket Entry No. 100) reiterates their position in earlier motions that Camp's prenuptial agreement, in which Camp expressly surrendered any right to the Plan, controls. Camp has filed a response (Docket Entry No. 102) that the Plan controls and that the deceased, Daniel Grissom, failed to act in good faith by failing to disclose his medical condition prior to execution of the prenuptial agreement thereby precluding any award of summary judgment to the Grissom Sons.

For the reasons stated below, the Court concludes that this controversy presents two competing and valid agreements under Tennessee law. The Plan is governed by Tennessee statutes and decisional law on contracts, and the prenuptial agreement is a valid contract permitted by Tennessee statute. Construing both agreements, the Court concludes that in the prenuptial agreement, Camp expressly agreed not to assert any claim against the Plan. The prenuptial agreement expressly listed the Plan and its value as the deceased Grissom's separate property. Camp's rights under the Plan are premised upon her status as the spouse of the deceased Grissom and in that capacity, Camp agreed to surrender that right. According to Tennessee decisional law, the disclosures for a prenuptial agreement involve disclosures of assets and the estimated value. Here, the prenuptial agreement expressly listed the Plan and its value and complies with Tennessee law. Camp lacks competent proof of the deceased Grissom's failure to disclose or to act in bad faith. These conclusions direct that the Plan's benefits be awarded to the Grissom sons in accordance with the prenuptial agreement and render moot the consideration of remaining matters.

4

# A. Findings of Fact[5]

The deceased Daniel Grissom applied for a "Simplified Employee Pension" Plan, with AXA that provided him a variable annuity contract, ("the Plan"). The Plan describes an employee's "individual retirement annuity" and provides, in pertinent part:

> **SECTION 1.01 EMPLOYER.** The term "Employer" means the sole proprietor, partnership or corporation which has adopted a Plan. A sole proprietor is deemed to be his own Employer and a partnership is deemed to be the Employer of each partner.
>
> **SECTION 1.02 PLAN.** The term "Plan" means (i) a program established by an individual which requires amounts contributed thereunder to be applied to the purchase of individual retirement annuities within the meaning of section 408(b) of the Code and (ii) **a written program established by an Employer constituting a "Simplified Employee Pension" under Section 408(k) of the Code which requires amounts contributed thereunder to be applied to the purchase of individual retirement annuities within the meaning of Section 408(b) of the Code.**
>
> **SECTION 1.03 ANNUITY.** The term "Annuity" means an individual retirement annuity meeting the requirements of Section 408(b) of the Code.
>
> **SECTION 1.04 ANNUITY BENEFITS.** The term "Annuity Benefits" means a benefit payable by AXA Equitable pursuant to Section 3.04 of the Contract.
>
> **SECTION 1.05 PARTICIPANT.** The term "Participant" means a person who has been enrolled by AXA Equitable under the Contract pursuant to a Plan for the purpose of purchasing an Annuity under the Contract. A person shall become enrolled under the Contract upon receipt by AXA Equitable of an enrollment form made available by AXA Equitable and completed in a manner satisfactory to AXA Equitable. A person who has been enrolled under the Contract shall be a Participant-owner under the certificate during his lifetime. An Annuity is purchased for a person enrolled under the Contract upon receipt by AXA Equitable of an initial Contribution for the Participant.

---

[5] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Here, Camp filed a statement of undisputed facts with her motion for summary judgment (Docket Entry No. 56), but failed to support each disputed fact by a specific citation to the record, as required by Local Rule 56.01 (c). The Grissom sons' response to Camp's statement of facts (Docket Entry No. 77) "fails to properly support an assertion of fact or fails to properly address [Camp's] assertion[s] of fact." Fed. R. Civ. P. 56(e). Subject to the requirement of admissibility, the Court concludes that there are not any material factual disputes. Id. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

*     *     *

**SECTION 4.01 CONTRACT.** The Contract may be changed by amendment or replacement upon agreement between the Contract Holder and AXA Equitable without the consent of any other person provided that such change does not reduce any Annuity Benefit provided before such change and provided that no rights, privileges, or benefits which have accrued to any Participant under the Contract may be reduced or forfeited except by the express consent of such Participant.

(Docket Entry No. 1-3 at 3, 13) (emphasis added).

As to the designation of beneficiaries upon the participant's death, the Plan reads as follows:

Upon election by a Participant pursuant to Section 3.03 of an annuity form providing payments for a period certain, such Participant may designate (with the right to change such designation) a person or persons to receive any payments that may become due after the death of the person or persons upon whose life or lives the income may depend.

The **payee may designate** (with the right to change such designation and without the concurrence of any other person) **a person or persons to receive any payments or installments payable after such payee's death, if the absence of such a designation would result in a single sum payment to such payee's executors or administrators in accordance with the following paragraph.**

**If at the death of any payee there is no designated person living entitled to receive any remaining payments or installments,** AXA Equitable will pay in a single sum to such payee's executors or administrators the commuted value of any remaining payments or installments.

(<u>Id.</u> at 11-12 (emphasis added).) The original contract provided that any change of the beneficiary designated by Grissom must "be made by written notice in a form satisfactory to AXA Equitable." (Docket Entry No. 1-3 at 13). On his application for this Plan, the deceased Daniel Grissom listed "Peggy M. Grissom – wife" as the "Beneficiary." (Docket Entry No. 1-2 at 2).

Sometime in February 2000, AXA amended the Plan with the following endorsement that reads, in pertinent part:

6

> Any part of a death benefit payable…for which there is no designated beneficiary living at your death will be payable in a single sum to your surviving spouse, if any; if there is no surviving spouse, then to the children who survive you, in equal shares; if there are no children, then to your estate.

(Docket Entry No. 1-4 at 5 & Docket Entry No. 57-4 at 2). After the plan amendment, the deceased Daniel Grissom did not designate an alternative or contingent beneficiary. (Docket Entry No. 78 at ¶ H). The distribution of this endorsement to deceased Grissom is unclear, but the endorsement was mailed to all participants. On October 9, 2008, Peggy Grissom died. (Docket Entry No. 56-5 at 2). After Peggy Grissom's death, the deceased Daniel Grissom did not designate an alternative or contingent beneficiary.

In his will dated May 18, 2009, Grissom established a trust, but the source of the trust funds is unclear. (Docket Entry No. 1-5 at 6-10). The deceased Daniel Grissom's will does not contain an express reference to the disposition of his "individual retirement annuity." Yet, the deceased Daniel Grissom's will designed the disposition of his "Residual Estate" as follows:

### ARTICLE VIII. RESIDUAL ESTATE

After payments of all debts, taxes and costs of administration of my estate, and after satisfaction of the foregoing devises and bequests; **all the rest, residue and remainder of the property which I own at the time of my death, real, personal and mixed, tangible and intangible, of whatsoever nature and wheresoever situate; including all property which I may acquire or become entitled to after the execution of this Will, and all lapsed legacies and devises, all life insurance payable to my estate, I hereby will, bequeath and devise unto my three sons,** *per stirpes*, **JASON ALAN GRISSOM, DANIEL BRADY GRISSOM and JOSHUA SETH GRISSOM, if they shall survive me.**

(Docket Entry No. 1-5 at 10-11) (emphasis added).

On or about April 15, 2010, the deceased Daniel Grissom entered into a prenuptial agreement with Camp that contains definitions and sets forth the respective rights to Grissom and Camp's respective personal and real properties:

7

(c) **"Separate Property" means property owned by either party which is and will remain, or may be acquired as that party's individual property, free from any claims of the other party.** "Separate property" is not party of the community property estate in any state recognizing community property.

8. WIFE'S SEPARATE PROPERTY. The wife is the owner of certain property, which is set forth and described in Exhibit C attached hereto and made a part hereof, which she intends to keep as her non-marital, separate, sole and individual property. All income, rents, profits, interest, dividends, stock splits, gains, and appreciation in value, relating to any such separate property shall also be deemed separate property.

9. **HUSBAND'S SEPARATE PROPERTY. The Husband is the owner of certain property, which is set forth and described in Exhibit D attached hereto and made a part hereof, which he intends to keep as his non-marital, separate, sole and individual property. All income, rents, profits, interest, dividends, stock splits, gains, and appreciation in value, relating to any such separate property shall also be deemed separate property.**

(Docket Entry No. 56-8 at 4) (emphasis added).

In "Exhibit B" to the prenuptial agreement, the deceased Grissom listed as his "separate property" the following:

### ITEM 2: ASSETS

| Description; | Value |
|---|---|
| 1.  Cash (on hand or in banks): | $10,000 |
| **2.  SEP Retirement Account** | **$500,000.00** |
| 3.  Life Insurance | $300,000.00 |

**Real Estate:**

| | |
|---|---|
| 1.  115 Holloway Square<br>Smyrna, TN 37167<br>(Current Residence) | $350,000.00 |
| 2.  Farm in Hopkins Co., Kentucky | $150,000.00 |

**Automobiles**

| | |
|---|---|
| 1.  Personal Vehicle | $15,000.00 |

8

**Other Personal Property**

| | |
|---|---|
| Clothing and Personal Items | $25,000.00 |
| Contents of Home | $100,000.00 |
| Jewelry | $0.00 |

**Business Ownership/Interest:**

| | |
|---|---|
| 1. D.G. Transportation Services, LLC | $300,000.00 |

(Id. at 20-21 (emphasis added)). At the end of this list, the deceased Daniel Grissom certified that, "[t]he above information is true and accurate to the best of my knowledge, and is based upon information currently available to me. This information is being provided in connection with a Premarital Agreement, and this statement shall be attached to said Premarital Agreement." (Id. at 21.) On April 13, 2012, two days before her marriage to the deceased Daniel Grissom, Camp acknowledged receipt of the designation of the deaceased Daniel Grissom's "Separate property" and provided a written acknowledgment on April 15, 2010. (Id. at 22.)

In the following language in this prenuptial agreement, the deceased Daniel Grissom and Camp also agreed to the disposition of their properties in their estates upon their deaths.

> 18. DISPOSITION UPON DEATH. Each party consents that his or her estate, or the estate of the other, may be disposed of by will, codicil, or trust, or in the absence of any such instrument, according to the laws of descent and distribution and intestate succession as if the marriage of the parties had not taken place. In either event, **the estate shall be free of any claim or demand** of inheritance, dower, curtsey, elective share, family allowance, homestead ejection, right to serve as executor, administrator or personal representative, **or any spousal or other claim given by law, irrespective of the marriage and any law to the contrary.** Neither party intends by this agreement to limit or restrict the right to give to or receive from the other an inter vivos or testamentary gift. **Neither party intends by this agreement to release, waive, or relinquish any devise or bequest left to either by specific provision in the will or codicil of the other, any property voluntarily transferred by the other**, any joint tendency created by the other, or any right to serve as executor or personal representative of the other's estate if specifically nominated in the other's will or codicil.

9

19. LIFE INSURANCE. Any policies in effect upon death of a spouse will go in its entirely to the party(s) designated as beneficiary(s).

* * *

24. FREE AND VOLUNTARY ACT. The parties acknowledge that executing this settlement agreement is a free and voluntary act, and has not been entered into for any reason other than the desire for the furtherance of their relationship in marriage. Each party acknowledges that he or she has had adequate time to fully consider the consequences of signing this agreement, and has not been pressured, threatened, coerced or unduly influenced to sign this agreement.

* * *

28. BINDING AGREEMENT/NO OTHER BENEFICIARY. This agreement shall be binding upon the parties, and upon their heirs, executors, personal representatives, administrators, and assigns. No person shall have a right or cause of action arising or resulting from this agreement except those who are parties to it and only their successors in interest.

(Id. at 6, 8 (emphasis added)). On April 16, 2010, Camp and Grissom married. (Docket Entry No. 57-6 at 2).

On June 30, 2010, Daniel M. Grissom died. (Docket Entry No. 57-7 at 2). Grissom's death certificate names Camp as his surviving spouse. (Id.) After Grissom's death, on March 24, 2011, Jason A. Grissom, as the administrator of his father's estate, applied for benefits under the Plan for the benefit of the three sons. (Docket Entry No. 1-3 at 1-9). AXA established an account for each of the sons in the amount of $206,646.42. (Id. at 3, 5.) Daniel B. and Joshua S. Grissom withdrew $40,000 and $80,000 from their accounts, respectively. On June 1, 2011, Camp, through her counsel, asserted a claim to the Plan's death benefit as Grissom's surviving spouse. (Docket Entry No. 1-7 at 2). AXA agreed with Camp that a portion of the death benefit was mistakenly paid to Daniel B. and Joshua S. Grissom. (Docket Entry No. 1 ¶¶ 15-16). Camp concedes that AXA did not act in bad faith.

10

In response to the Grissom sons' motion for summary judgment, Camp filed her affidavit asserting that the deceased Daniel Grissom did not disclose his medical condition, prior to her executing the prenuptial agreement. Camp asserts that she would not have executed the agreement, if those medical disclosures were made:

> 3. Before signing the prenuptial agreement, Mr. Daniel M. Grissom did not disclose to me that he had Hepatitis C.
>
> 4. Before the marriage, Mr. Daniel M. Grissom did not disclose to me that he had Hepatitis C.
>
> 5. Before signing the prenuptial agreement, Mr. Daniel M. Grissom did not disclose to me that he had cirrhosis.
>
> 6. Before the marriage, Mr. Daniel M. Grissom did not disclose to me that he had cirrhosis.
>
> 7. Before signing the prenuptial agreement I did not know that Mr. Daniel M. Grissom had Hepatitis C or cirrhosis.
>
> 8. Before the marriage, I did not know that Mr. Daniel M. Grissom had Hepatitis C or cirrhosis.
>
> 9. My grandchildren were around Mr. Daniel M. Grissom's person and his belongings often. Had I have known that Mr. Daniel M. Grissom had Hepatitis C, I would never have allowed my grandchildren to be near him due to the danger of contracting the disease.
>
> 10. Mr. Grissom promised before and during our engagement and before the signing of the prenuptial agreement that if anything happened to Mr. Grissom that he would see that I was taken care of.
>
> 11. If I had known of Mr. Grissom's Hepatitis C and cirrhosis of the liver. I would never have signed the prenuptial agreement.

(Docket Entry No. 102-2 at 3).

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee's note. Moreover, "district courts are widely acknowledged to possess the

11

power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the losing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986); <u>accord</u> <u>Routman v. Auto. Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

<u>Id.</u> at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex</u>, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman</u>, 873 F.2d at 971.

12

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991) (quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons</u>, 874 F.2d at 353 (quoting <u>Celotex</u>, 477 U.S. at 323 & Fed. R. Civ. P 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]...must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted); <u>see also</u> <u>Hutt v. Gibson Fiber Glass Products</u>, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting <u>Liberty Lobby</u>, 477 U.S. at 251-52).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

*    *    *

> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Id.</u> at 248, 252 (citation omitted and emphasis added).  It is likewise true that:

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant.  Further, the papers supporting the movant are closely scrutinized, whereas the opponents are indulgently treated.

> It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues.  It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted).  As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

14

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1986), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

15

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) Has the moving party "clearly and convincingly" established the absence of material facts?; (2) If so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) If factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) Are there any genuine factual issues with respect to those material facts under the governing law?

This action was filed under 28 U.S.C. § 1332, the federal diversity statute, and, 28 U.S.C. § 2201, the Declaratory Judgment Act. Although the parties' motion papers initially analyzed the claims under state law claims, the Court raised the issue with the parties whether the Plan falls under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 et seq. If an action relates to an employee benefit plan and is brought by "a participant, beneficiary" or "fiduciary," ERISA preempts all state law claims. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 55-58 (1987); 29 U.S.C. § 1132(a)(1). Under 29 U.S.C. § 1132(a)(3), a fiduciary may bring a civil action, but only "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief (i) to redress such violations; or (ii) to enforce any other provisions of this Title for the terms of the plan." Id. § 1132(a)(3). Here, AXA is a party. The Plan at issue here is a "Simplified Employee Pension" that cites ERISA. The other parties contend that there are beneficiaries under the Plan. The Court ordered the parties to brief the ERISA issue.

From the parties' briefing on the ERISA issue, the critical and undisputed fact is that the deceased Daniel Grissom was the **only** person covered by AXA's "Simplified Employee

16

Pension" Plan. As a result, the AXA Plan is not subject to ERISA as a matter of law. <u>Raymond</u>

<u>B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon</u>, 541 U.S.1 (2004). There, the United States

Supreme Court stated:

> This case presents a question on which federal courts have divided: Does the working owner of a business (here, the sole shareholder and president of a professional corporation) qualify as a "participant" in a pension plan covered by the Employee Retirement Income Security Act of 1974 (ERISA or Act), 88 Stat. 832, as amended, 29 U.S.C. § 1001 *et seq.* **The answer, we hold, is yes: If the plan covers one or more employees other than the business owner and his or her spouse, the working owner may participate on equal terms with other plan participants. Such a working owner, in common with other employees, qualifies for the protections ERISA affords plan participants and is governed by the rights and remedies ERISA specifies**. In so ruling, we reject the position, taken by the lower courts in this case, that a business owner may rank only as an "employer" and not also as an "employee" for purposes of ERISA-sheltered plan participation.

<u>Id.</u> at 6 (emphasis added). Thus, the Court concludes that the parties' claims are not governed by

ERISA.[6]

---

[6]
Under ERISA, although the prenuptial agreement is not referenced in the Plan, the prenuptial agreement could be considered. In two unreported decisions, the Sixth Circuit held that with one exception, for uniform administration, the ERISA plan controls the payment of benefits under the plan to the designated beneficiary. <u>Greenebaum Doll & McDonald PLLC v. Sandler</u>, 256 Fed. Appx. 765, 767-69 (6th Cir. 2007); <u>Callahan v. Hutsell, Callahan & Buchino, P.S.C., Reserved Profit Sharing Plan</u>, 14 F.3d 600, 1993 WL 533557 (6th Cir. Dec. 20, 1993). The exception is <u>Callahan</u>, where "Nancy Callahan both waived her interest in Ed Callahan's retirement plans and agreed to execute, "as soon as possible" after the wedding, "a designation form that Ed presumably intended to give to the plan administrator ... in order to renew his designation of [his estate] as beneficiary under [his retirement] plans." As part of the agreement, Nancy also "acknowledged that she would not be entitled to a death benefit under the plans." <u>Sandler</u>, 256 Fed.Appx. at 768-69 (quoting <u>Callahan</u>,1993 WL 533557 at * 1). If ERISA applied, the Court would conclude that in the prenuptial agreement, the deceased Daniel Grissom clearly listed his "SEP Retirement Account $500,000.00" as his "Separate Property." (Docket Entry No. 56-8 at 20-21). Under the Camp's prenuptial agreement, "'Separate Property' means property owned by either party which is and will remain, or may be acquired as that party's individual property, free from any claims of the other party." (<u>Id.</u> at 8.) Camp further expressly agreed in the prenuptial agreement that she would not assert any claim against Grissom's estate: "**the estate shall be free of any claim or demand of** inheritance, dower, curtesy, elective share, family allowance, homestead ejection, right to serve as executor, administrator or personal representative, or **any spousal or other claim given by law, irrespective of the marriage and any law to the contrary**." (<u>Id.</u> at 8 (emphasis added)). Thus, under ERISA and <u>Callahan</u>, the Court would have concluded that Grissom intended and Camp

As to Tennessee law, in a contract action, "[t]he ascertainment of the intention of the parties to a written contract is a question of law or judicial function for the court to perform when the language is plain, simple and unambiguous." Forde v. Fisk Univ., 661 S.W.2d 883, 886 (Tenn. Ct. App. 1983) (citing Petty v. Sloan, 197 Tenn. 630 (1955)). "But, where the writing is not plain and unambiguous, and is such to require the aid of parol evidence, and the parol evidence is conflicting or such as admits of more than one conclusion, it is not error to submit the doubtful parts under the proper instructions to the jury." Forde, 661 S.W.2d at 886. The test for ambiguity is whether the phrase at issue has more than one possible interpretation, considering the agreement as a whole. Empress Health & Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 190-91 (Tenn. 1973); Gredig v. Tenn. Farmers Mut. Ins. Co., 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994).

Yet, as this Court observed, ambiguity as to a contract's term is not created because the parties disagree as to its meaning. Oman Constr. Co. v. Tenn. Valley Auth., 486 F. Supp. 375, 382 (M.D. Tenn. 1979). One party's view of the contract does not necessarily mean that such provisions are part of the contract. D.L. Bouldin Constr. Co. v. Regal Wood Prods., Inc., (In re D.L. Bouldin Constr. Co.), 6 Bankr. 288, 295 (Bankr. E.D. Tenn. 1980). Tennessee law generally allows enforcement of the parties' contract as written without questioning the wisdom of the contract or the harshness of its enforcement absent some public policy consideration. Metro. Life Ins. Co. v. Humphrey, 70 S.W.2d 361, 362-63 (Tenn. 1934); Wilson v. Scott, 672 S.W.2d 782, 786 (Tenn. Ct. App. 1984); see also Dynamic Enters., Inc. v. Fitness World, Inc. (In re Dynamic Enters.), 32 Bankr. 509, 518 (Bankr. M.D. Tenn. 1983).

_____

accepted that the Plan annuity benefit was Grissom's separate property to which Camp agreed to surrender any claim to the Plan.

Prenuptial agreements are approved by Tennessee statutory law and are "favored and not repugnant to the public policy of [Tennessee]." Cary v. Cary, 937 S.W.2d 777, 781 (Tenn.1996). The Tennessee Code provides as follows:

> Notwithstanding any other provision of law to the contrary, . . . any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without the exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Tenn. Code. Ann. § 36-3-501 (West 2000).[7] Here, the prenuptial agreement between Camp and Grissom is favored under Tennessee law. The Court turns to the question of what effect the prenuptial agreement has on the Plan under Tennessee law.

The principles of contract law, not family law, govern the designation of beneficiaries of insurance or annuity policies under Tennessee decisional law. In Bowers v. Bowers, 637 S.W.2d 456 (Tenn. 1982), the Tennessee Supreme Court addressed the split among the Tennessee state courts on whether a divorce decree surrendering property rights precludes the claim of an ex-wife who remained the named beneficiary on her former husband's insurance or annuity policy. The Tennessee Supreme Court looked to  Hergenrather v. State Mutual Life Assurance Company of Worcester, 68 N.E.2d 833 (Ohio Ct. App. 1946), to determine that the ex-wife's right to receive life insurance proceeds arose out of contract law, not from the spousal relationship. The Tennessee Supreme Court quoted the pertinent facts and rationale of the Ohio decision:

> In Hergenrather wife remained as beneficiary of husband's life insurance for a period of two years following the entry of a divorce decree approving a property settlement wherein wife relinquished all claims against husband arising out of the marital relationship in language even more comprehensive than appears in the

---

[7]In Cary v. Cary, 937 S.W.2d 777 (Tenn.1996), the Tennessee Supreme Court upheld this statute against challenges based upon Tennessee precedents. Id. at 781.

settlement agreement in the instant case. It was the contention of husband's estate that by the terms of the separation agreement wife had relinquished and forfeited her rights as beneficiary under the policy. The essence of the Ohio Court's response was as follows:

> "The right of the wife to recover the proceeds of the policy does not hinge on the existence of a relationship of husband and wife, but rather on the well established principles of contract law. . . . The fact that her status had changed before the death of the insured did not in any manner deprive her of a right she already possessed. The words 'Wife of the insured' after the name of the beneficiary were merely descriptive.

> Her right did not arise out of the relation of husband and wife. True, she was his wife at the time the policy was issued and this fact undoubtedly was the reason why she was named as beneficiary, but her property interest in the policy did not arise out of the marriage relation.

> **It is our view that the property settlement agreement had no force and effect whatever upon the life insurance policy and neither the agreement nor the divorce terminated wife's status as named beneficiary in the policy or her right to receive the proceeds.**

Bowers, 637 S.W.2d at 458-59 (citations omitted and emphasis added) (citing Hergenrather, 68 N.E.2d at 835).

Later, in Mathews v. Harris, 713 S.W.2d 311 (Tenn.1986), the Tennessee Supreme Court held that the beneficiary designation of a former wife by name was not affected by the subsequent divorce proceedings nor by the parties' property settlement agreement waiving future claims. Id. at 312. The Tennessee Supreme Court later explained Harris, in Matthew v. Burkeens, 763 S.W.2d 739 (Tenn. 1988), stating,

> In Mathews v. Harris, 713 S.W.2d 311 (Tenn.1986), however, the deceased employee had apparently been a member of a superseded system. **The employee had become a member of the retirement system in 1947, when he had designated his wife as his beneficiary. In 1965 he had executed a second form naming his wife as beneficiary. He made no subsequent designations.** The employee and his wife were divorced in 1982 and a month later the employee remarried. This second wife was his legal surviving spouse when he died a short time later. The State Treasurer filed a suit for interpleader to determine the proper recipient of the funds. The second wife argued that the terms and provisions of

20

the property settlement agreement between her husband and his former wife vitiated the 1965 designation of beneficiary. Relying on Bowers v. Bowers, 637 S.W.2d 456 (Tenn.1982), . . . this Court stated that as in the case of the designation of a beneficiary on a life insurance policy, the previous designation was not affected by the subsequent divorce proceedings which made no reference to it.

A second issue in Harris involved the second wife's entitlement to benefits as a surviving spouse under T.C.A. § 8–36–109. Since the benefits were only payable if the spouse was designated as beneficiary, the Court held that the second wife was not entitled to survivor's benefits. As can be seen, there was no assertion in Harris that the deceased was still covered by a superseded system at the time of his death so that the issue raised here was never discussed by the Court in Harris.

Id. at 741-42 (emphasis added).

Since Bowers, Harris and Burkeens, the Tennessee appellate courts have stated that "[i]t is settled law in Tennessee that the designation of beneficiaries on life insurance policies and death benefits in annuity agreements are matters of contract between the participant and the company or organization issuing the policy of life insurance or funding the annuity agreement." Lunsford v. Lunsford, No. M2004-00662-COA-R3-CV, 2005 WL 2572389, at *2 (Tenn.Ct.App. Oct. 12, 2005). Tennessee law makes "no practical distinction between a death benefit in an annuity agreement and the death benefit in a retirement plan." Id. at *3. Designation of beneficiaries in these contracts cannot be altered "by will, . . . by completing a survey conducted by an employer, . . . or marital dissolution agreement." Id. at *2; see also Deckard v. Middleton, No. 01-A-01-9502-CH-005, 1995 WL 428677 (Tenn. Ct. App. July 21, 1995). Yet, the Deckard court observed that "[i]n each of the [Tennessee Supreme Court] cases . . . the beneficiary was designated by name, and there had been no change of designation between the time of execution and the death of the spouse." Id. at 1 (citing Bowers, 637 S.W.2d at 458).

To be sure, under Tennessee law, "the designation of beneficiaries on life insurance policies and the death benefits in annuity agreements are matters of contract between the

21

participant and the company or organization issuing the policy of life insurance or funding the annuity agreement. As such **the beneficiary may be changed only by substantially complying with the contract provisions.**" <u>Lunsford</u>, 2005 WL 2572389, at *2 (emphasis added); <u>cf.</u> <u>Shell v. Dills</u>, No. E2005-02636-COA-R3-CV, 2006 WL 3193659, at *3 (Tenn. Ct. App. Nov. 6, 2006) (holding that "the divorce and property settlement agreement had no effect on the beneficiary designation"). Thus, "in Tennessee a change of beneficiary must be accomplished in substantial compliance with the terms of the insurance [or annuity] contract" and "the language of a will does not operate to deprive the named beneficiary of her rights to policy proceeds." <u>In re Estate of Williams</u>, No. M2000-02434-COA-R3-CV, 2003 WL 1961805, at *18 (Tenn. Ct. App. Apr. 28, 2003).

Yet, parties may contract outside of the marital relationship to surrender beneficiary claims to a policy. In <u>Lunsford</u>, the Tennessee Court of Appeals ruled that where the beneficiary surrenders any claim to the plan, such a waiver is enforceable:[8]

> According to the testimony of Kurt R. Kaboth, the secretary and general counsel for the YMCA Retirement Fund, the specified method for changing a beneficiary was to contact the fund and ask for a Change of Beneficiary Form. The form would then have to be executed before a notary public and returned to the Fund's office. There was no evidence Mr. Lunsford ever communicated with the Fund concerning changing his designated beneficiary even though he was mailed a Benefits Statement dated June 30, 2003, indicating Tina Lunsford was the primary beneficiary of his pre-retirement death benefit. According to the contract between Robert W. Lunsford and the YMCA Retirement Fund, Tina Lunsford was the beneficiary of his pre-retirement death benefit at the time of his death.
>
> **The foregoing conclusion does not, however, end the inquiry before us. In the present case, the marital dissolution agreement provided that the appellant waived and released any right, title and interest which she had "to any retirement payment or annuity" by virtue of Robert Lunsford's employment. The agreement further provided that this waiver provision would have the**

---

[8] This was the same analysis as the Sixth Circuit in <u>Callahan</u> under ERISA. <u>See</u> <u>Callahan</u> <u>supra</u> note 6 at *1. Although federal and state law recognize a general rule that the plan decides the beneficiary based on the annuity contract, <u>Callahan</u> and <u>Lunsford</u> are narrow exceptions where there is an express waiver of the benefits as a beneficiary.

22

"same force and effect as if ... she had signed any waiver forms releasing ... her aforementioned interest." Finally, Tina Lunsford agreed "to execute whatever documents may be required in this regard in the future, as necessary, to accomplish the purposes heretofore stated." (emphasis added). It is this continuing duty to execute whatever documents that may be required to accomplish the purpose and intent of the marital dissolution agreement that differentiates this case from other cited cases. At the time of his death, Robert Lunsford clearly had a contractual right to require the appellant to execute any document that might be required to effectuate her waiver and release of any interest she might have in retirement or annuity benefits. Following his death, Mr. Lunsford's personal representative had the right to enforce this contractual provision in his behalf. Since the trial court could have required the appellant to execute a waiver and release of Mr. Lunsford's retirement plan death benefit, it was not error to divest the appellant of any interest she might have in the benefit and award it to the contingent beneficiaries by way of a QDRO.

Lunsford, 2005 WL 2572389 at *3 (emphasis added).

Here, the prenuptial agreement is a contract that stands apart from Camp's marital relationship with the deceased Grissom. By the prenuptial agreement, Camp surrendered her rights to assert any claim against the Plan and to receive any of the Plan's benefits:

18. **DISPOSITION UPON DEATH.** Each party consents that his or her estate, or the estate of the other, may be disposed of by will, codicil, or trust, or in the absence of any such instrument, according to the laws of descent and distribution and intestate succession as if the marriage of the parties had not taken place. In either event, **the estate shall be free of any claim or demand** of inheritance, dower, curtsey, elective share, family allowance, homestead ejection, right to serve as executor, administrator or personal representative, **or any spousal or other claim given by law, irrespective of the marriage and any law to the contrary.** Neither party intends by this agreement to limit or restrict the right to give to or receive from the other an inter vivos or testamentary gift. **Neither party intends by this agreement to release, waive, or relinquish any devise or bequest left to either by specific provision in the will or codicil of the other, any property voluntarily transferred by the other,** any joint tendency created by the other, or any right to serve as executor or personal representative of the other's estate if specifically nominated in the other's will or codicil.

(Docket Entry No. 56-8 at 6) (emphasis added). Neither the deceased Daniel Grissom nor Camp contemplated Camp acquiring any interest in the Plan. As quoted earlier and below, Camp

23

expressly acknowledged the lack of any duress in surrendering those rights. Applying <u>Lunsford</u>, the Court concludes that Camp's waiver of any rights to benefits under the Plan bars her claims to those benefits.

Camp next contends that the deceased Grissom did not disclose his medical conditions prior to the execution of the prenuptial agreement and if he had, Camp would not have signed that agreement. Tennessee law on disclosures for prenuptial agreements require only a reasonable disclosure of assets and their values, not medical conditions. <u>Kahn v. Kahn</u>, 756 S.W.2d 685, 694-96 (Tenn. 1988). To be sure, prenuptial agreements must be entered "freely, knowledgeably and in good-faith and without exertion of duress or undue influence." <u>Perkinson v. Perkinson</u>, 802 S.W.2d 600, 603 (Tenn. 1990) (noting that the three statutory requirements are "the only conditions on which an antenuptial agreement regarding marital property can be held invalid").

The prenuptial agreement here fully disclosed the deceased Grissom's assets and their value. Plaintiff has not submitted proof of undue influence or duress and in the prenuptial agreement, Camp signed the prenuptial agreement with the following provision:

> **24. FREE AND VOLUNTARY ACT.** The parties acknowledge that executing this settlement agreement is a free and voluntary act, and has not been entered into for any reason other than the desire for the furtherance of their relationship in marriage. Each party acknowledges that he or she has had adequate time to fully consider the consequences of signing this agreement, and has not been pressured, threatened, coerced or unduly influenced to sign this agreement.

(Docket Entry No. 56-8 at 8).

As to the deceased Daniel Grissom's alleged nondisclosures of medical conditions prior to the execution of the prenuptial as omissions evincing the lack of good faith, Camp has not submitted any proof that the deceased Grissom knew of these alleged conditions. Moreover, Camp, as a lay person, is not the proper witness to describe the deceased Daniel Grissom's

24

medical diseases. There has been ample time for discovery on this claim. Finally, given Camp's and the deceased Daniel Grissom's insistence in the prenuptial agreement to maintain their properties separate, the Court does not discern any proof that without the prenuptial agreement, any marriage would have occurred. Marriage is the necessary predicate for Camp's asserted right to the Plan benefits.

As to Camp's claim for attorney fees, under Tennessee law, "a party in a civil action may not recover attorney's fees absent a specific contractual or statutory provision providing for attorney's fees as part of the prevailing party's damages." House v. Estate of Edmonson, 245 S.W.3d 372, 377 (Tenn. 2008). There is no such contract here, and this claim is dismissed.

With these conclusions, the Court deems further consideration of all other motions and contentions moot. An appropriate Order is filed herewith.

**ENTERED** this the _11TH_ day of September, 2012.

WILLIAM J. HAYNES, JR.
Chief United States District Judge